**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

WILLIAM WHITTMAN,                    *

    *Plaintiff*,                    *          Civil Case No. 1:22–cv–1547–SAG

v.                    *

PPE CASINO RESORTS                    *
MARYLAND, LLC, *et al.*,
                        *

    *Defendants*.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**<u>DEFENDANTS PPE CASINO RESORTS MARLYAND, LLC'S, AND
THE CORDISH COMPANIES, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF
WILLIAM WHITTMAN'S COMPLAINT</u>**

Defendants PPE Casino Resorts Maryland, LLC, and The Cordish Companies, Inc.
(collectively referred to as "Defendants"), by and through their counsel, Todd M. Reinecker,
Matthew T. Healy, and PILIEROMAZZA, PLLC, respectfully submit this Memorandum of Law in
Support of their Motion to Dismiss the Complaint filed *pro se* by Plaintiff William Whittman
("Plaintiff").

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff, a U.S. citizen of Albanian heritage, frequented Maryland Live! Casino & Hotel
("Maryland Live! Casino" or "the casino") between the years 2018 and 2021. During these years,
Plaintiff played many games at the casino and, based on the Complaint, appears to have favored
video slot machines. At some point in 2021, Plaintiff voluntarily terminated his membership after
losing a game when, in his view and estimation, other players appeared to be enjoying a greater
level of success at the same games. Plaintiff commenced this *pro se* action in this Court on June
23, 2022, alleging Defendants engaged in (1) unlawful discrimination in areas of public

accommodation in violation of Title II of the Civil Rights Act of 1964 (hereinafter "the CRA"), codified at 42 U.S.C. § 2000, *et seq.*; (2) unlawful retaliation in violation of the CRA; and (3) unfair or deceptive trade practices in violation of Maryland's Consumer Protection Act ("MCPA"), codified at MD. CODE ANN., COM. LAW § 13–301, *et. seq.* The Complaint also appears to advance three common law claims for defamation, false arrest, and malicious prosecution. Plaintiff has demanded a jury trial and is seeking One Million Two Hundred Thousand Dollars ($1,200,000) in compensatory damages and Three Hundred Fifty Thousand Dollars ($350,000) in punitive damages.

Defendants deny all liability and respectfully submit that Plaintiff has failed to state a claim upon which relief may be granted. Dismissal is warranted because Plaintiff's statutory claims arise from alleged acts and events in 2017, 2018, and early 2019, which is clearly beyond the statute of limitations since suit was commenced on June 23, 2022. Even if Plaintiff's statutory claims of unlawful discrimination and retaliation were not untimely, dismissal is still appropriate because Plaintiff (i) failed to provide the requisite notice to Maryland's Commission on Civil Rights prior to initiating suit and (ii) seeks only monetary damages, which the CRA does not permit. Separate and apart from those legal deficiencies, dismissal is warranted because his CRA claims are not well pled. Plaintiff's claim that Defendants engaged in "unfair or deceptive trade practices" is similarly deficient since it does not include sufficient factual support that Plaintiff suffered an objectively identifiable injury.

Plaintiff's common law claims must also be dismissed at the pleading stage. With respect to Plaintiff's defamation claim, the Complaint fails entirely to identify any statement made by Defendants that was false or published to a third party. With regards to false arrest and malicious prosecution, the Complaint fails to allege sufficient factual detail to state a claim for either cause

of action. Accordingly, Defendants respectfully request that the Court dismiss Plaintiff's Complaint in its entirety.

<u>S</u><u>TATEMENT OF</u> <u>F</u><u>ACTS</u>[1]

Plaintiff is an Albanian American who "look[s] and sound[s] foreign born." *See* Docket Entry ("DE") #1, at ¶¶ 17, 46–47, 257. Between the years 2017 and 2021, Plaintiff frequented Maryland Live! Casino to play video slot machines; specifically, the Progressive Sun Moon and the Progressive Triple Seven Blazing. *Id.,* at ¶¶ 18–19, 28–29, 31, 43, 80. These machines pay out at varying rates, but both allow for progressive betting. *Id.*, at ¶¶ 34, 49. Plaintiff claims he played the Progressive Triple Seven Blazing machines because "[D]efendants advertis[ed]" them "as 98% *pay back machines*" regardless of whether the game resulted in a jackpot or not. *Id.*, at ¶¶ 50, 55 (italics in original).

Plaintiff visited Maryland Live! Casino so frequently that he became a "black card member." *Id.*, at ¶ 36. As a "black card member," the casino offered Plaintiff certain benefits and privileges not extended to other players, including the right to place a four (4) hour hold on a video slot machine by having it disabled from floor service, and thus unavailable for play by other patrons. *Id.*, at ¶ 36. Throughout his years of playing at Maryland Live! Casino, Plaintiff claims to have experienced instances in which his use of his membership card was not what he had hoped. *See generally* DE #1.

In January or February 2017, Plaintiff was playing a Progressive Sun Moon machine when acquaintances of his, who are Latino, approached him. *Id.*, at ¶ 32. They informed him that, in their estimation and belief, a separate video slot machine was close to a progressive payout and

---

[1]    Solely for the purposes of Defendants' Motion to Dismiss, and without conceding the veracity of any allegation, the following facts are taken entirely from Plaintiff's Complaint.

offered him a chance to play that machine. *Id*., at ¶ 33. Plaintiff switched to that machine. *Id.*, at ¶ 34. After about thirty minutes or so of play, Plaintiff chose to return to the original machine that he had been playing since he had yet to receive his anticipated payout. *Id.*, at ¶ 35. Before leaving, Plaintiff called a Slot Attendant to request that the machine that he was playing be blocked from the floor. *Id.*, at ¶ 37. That request was apparently granted. *Id.*, at ¶ 38. Plaintiff returned to his original slot machine to resume play. *Id.* Shortly thereafter, the Slot Attendant told Plaintiff that he could not block a machine while simultaneously playing another machine. *Id.*, at 39. He was given the choice of continuing to play one machine or the other with the understanding that whichever machine he did not choose would be placed back into service and available to other casino patrons. *Id.*, at ¶ 40. Having seen other "black card members" use their membership status to reserve multiple machines simultaneously, Plaintiff was disturbed by this allegedly "differential" treatment, but continued to return to the casino for years following. *Id.*, at ¶ 41.

In or about April 2018, Plaintiff was again at Maryland Live! Casino playing a Progressive Triple Seven Blazing machine. *Id.*, at ¶ 63. Plaintiff played until he exhausted his funds. *Id.*, at ¶ 64. Rather than stop, Plaintiff chose to wait for "J. Lee," a friend of his who is Korean and with whom he apparently "collaborates" when the "limits" of his playing funds "[are] reached," so that he can continue playing a machine in the "hope that it might pay."  *Id.*, at ¶¶ 59–63. To prevent other patrons from playing the slot machine that he had been playing, Plaintiff called a Slot Attendant and requested that the machine be blocked from the floor. *Id.*, at ¶ 64. And, apparently, it was, at least initially. *Id.*, at ¶ 65. Plaintiff was sitting next to a second friend, "Sylvia," while waiting for J. Lee to arrive. *Id.*  Plaintiff alleges that Sylvia is black. *Id*. He was later told by the Slot Attendant that he could only block the subject machine from other players on the floor when "go[ing] to eat or go[ing] to get more money."  *Id.*, at ¶ 68. Accordingly, Plaintiff left Maryland

Live! Casino to ensure that "his blocked machine [was not] given to others…." *Id.*, at ¶ 70. Plaintiff was unhappy with how his "black card" privileges were seemingly limited or curtailed because, according to Sylvia, the casino had "never [told] this to us (meaning to those who do not look or sound foreign born)." *Id.*, at ¶ 68.

Later that year, in June 2018, Plaintiff was again at Maryland Live! Casino playing a Progressive Triple Seven Blazing machine. *Id.*, at ¶ 71. A couple video slot machines in the area near Plaintiff were being played by other patrons who "were losing [at] a faster speed" than Plaintiff. *Id.*, at ¶ 72. Plaintiff planned to move over to one of those other machines if one of the other patrons were to leave "without getting back some of the money [they] had spent." *Id.*, at ¶ 73. When the other players eventually left, Plaintiff was not able to claim any of the subject machines because "an *American Born Black Lady* jumped in and got both machines." *Id.*, at ¶ 74 (italics in original). The lady played both machines briefly; she only "spun" a few times before calling a Slot Attendant to block them. *Id.*, at ¶ 75, 77. Plaintiff asked why her request was honored since "she . . . only inserted a couple of dollars to give the impression she had been playing those machines, while she had not." *Id.*, at ¶ 79. The Slot Attendant allegedly advised that "[i]f a player has a black card and is sitting on a machine, the player has the right to block the machine with no questions asked even if she only has had only [sic] one spin." *Id.*

The following weekend, June 10, 2018, Plaintiff returned to Maryland Live! Casino at 10:30 a.m. to meet J. Lee. *Id.*, at ¶¶ 80, 83. J. Lee had been playing "all night long" on Progressive Triple Seven Blazing No. 13–18–02. *Id.* Plaintiff and J. Lee continued playing No. 13–18–02 "to increase [their] chance to win and reduce the risk of losing more" in the hope of getting some of their lost money back through "the 98%" payback. *Id.*, at ¶ 86. Plaintiff alleges they had to play No. 13–18–02 since "a black *American Born-Guest* by the name of Maurice" was playing all the

other machines with other players by "going round and round with one spin per machine, leaving money in every machine for the next spin." *Id.*, at ¶¶ 89–90 (italics in original). Plaintiff and J. Lee played No. 13–18–02 until 2:00 p.m. before deciding to "take a break." *Id.*, at ¶¶ 94–95. When they asked a Slot Attendant, "Kim," who is white, to block No. 13–18–02, Maurice intervened to tell Plaintiff that he could not block the machine since he was not playing and proceeded to speak privately with Kim. *Id.*, at ¶¶ 95–97. Plaintiff does not know and does not describe what Maurice said to Slot Attendant Kim, but, afterwards, Slot Attendant Kim requested Plaintiff's "black card" to check if he had played No. 13–18–02 "enough" to be able to block it. *Id.*, at ¶¶ 99–103. Plaintiff had never seen such a request made of "American born players." *Id.* Slot Attendant Kim returned with the Floor Manager, "Rhonda," who is black, and informed Plaintiff that he had not played enough to block No. 13–18–02. *Id.*, at ¶¶ 108–10. Plaintiff pushed back on that decision, which ultimately led a separate Floor Manager, "Cooper," and two (2) security guards to get involved. *Id.*, at ¶¶ 112–14. This experience apparently "humiliated" Plaintiff. *Id.* Floor Manager Cooper advised that Plaintiff could not block the machine because he and J. Lee had not played enough. *Id.*, at ¶¶ 129–30. Plaintiff believed that he was being treated differently because a "*black lady had blocked two of these machines*" the prior week. *Id.* (italics and underline in original). Plaintiff asked Cooper to tell him the amount he had spent and the amount he needed to spend to block the machine, but Cooper refused and allegedly said, "I can't tell you that, it is up to our judgment." *Id.*, at ¶¶ 140–41. Whether or not Plaintiff and J. Lee continued to play No. 13–18–02 after this exchange or, alternatively, whether they eventually blocked it, is unclear. *See generally* DE #1.

Two weeks later, on Sunday, June 23, 2018, at about 2:00 a.m., an "American sounding and looking black lady" was allowed to block video slot machine "no. 13–8–04" without having

her membership card checked for "how much she had spent or how long she had played." *Id.*, at ¶¶ 142–144.

On another occasion, Saturday, July 21, 2018, at about 2:00-3:00 a.m., Plaintiff was at Maryland Live! Casino waiting for a Progressive Triple Seven Blazing Machine to become available while "Maurice" was playing each of them. *Id.*, at ¶¶ 186, 198. A security guard approached Plaintiff while he was waiting and asked if he had been playing that night. *Id.*, at ¶ 204. Plaintiff said yes. *Id.*, at ¶ 205. The security guard told Plaintiff that he was "overshadowing people" and needed to leave the casino, which Plaintiff did. *Id.*, at ¶¶ 216, 219, 221.  As Plaintiff left, he observed others in the casino who were not playing but seemed to be permitted to stay – all of whom "looked American born."  *Id.*, at ¶ 222. Plaintiff re-entered the casino to take photographs of these guests. *Id.*, at ¶¶ 226, 233. Plaintiff then went up to the security guard who had ordered him to leave and presented him with the photographs. *Id.*, at ¶ 237, 240. After that, Plaintiff voluntarily left the casino. *Id.*, at 241.

Plaintiff returned to Maryland Live! Casino once again on July 29, 2018—just over a month later. *Id.*, at ¶¶ 243, 256. This time he was with J. Lee and Sylvia, the latter of whom is American born. *Id.*, at ¶¶ 244–45. Sylvia wanted to take a break and asked Plaintiff to use his "black card" to block her machine for a few hours "as they, American born guests, did all the time, for each other." *Id.*, at ¶¶ 246–47. Plaintiff declined to do so given Floor Managers Kim and Rhonda's earlier decision to check his card. *Id.*, at ¶¶ 248–49. Plaintiff, however, offered to give his "black card" to Sylvia so that Sylvia could present it to the casino for purposes of blocking her machine. *Id.*, at ¶ 254. He did not expect the casino to honor the request. *Id.*, at ¶ 258. To Plaintiff's "shock and bewilderment," the casino did block Sylvia's machine, which Plaintiff believes was

only done because an "American born" benefited from this particular exercise of the privileges. *Id.*

Plaintiff was "shocked" when, on August 18 or 19, 2018, a Slot Attendant returned a machine blocked by a "Chinese or Korean player" to service so that a "white American lady" and her husband could play, particularly since the player who blocked the machine was "driving home to get more money." *Id.*, at ¶¶ 275–78. Shortly after the white American lady began to play, the machine "got hot as if touched by a magic wand, and started to hit red sevens after red sevens once the white couple" inserted their membership card. *Id.*, at ¶ 283. The white American lady then left the machine allowing the Slot Attendant to place the machine "back out of service, to hold for the Asian guy…" *Id.*, at ¶¶ 285–86. This was not the only instance Plaintiff suspected foul play since he and his American born friends, in July 2018, had varying success on the same machine. *Id.*, at ¶¶ 148, 150, 155 (alleging the casino monitors the "black cards" used to start play or employs facial recognition for the "exploitation of the foreign born players for the interest and the benefit of the American born").

On Friday, October 18, 2019, at about 7:50 p.m., Plaintiff was apparently withdrawing money from two of Maryland Live! Casino's ATM machines. *Id.*, at ¶ 311. A "young [black] woman who looked [American] approached" him as he did so. *Id.*, at ¶ 314. A dispute ensued between Plaintiff and the young woman regarding the money dispersed by one of the ATMs. *Id.*, at ¶ 317–18. Plaintiff claims that the young woman became aggressive and appeared to become emboldened by the fact that no one at the casino was intervening. *Id.*, at ¶ 320. Plaintiff asked her to leave him alone and, when she did not, he began to walk to a nearby restroom to get away. *Id.*, at ¶¶ 321, 325. The young woman continued to demand the money, but did not follow him inside. *Id.*, at ¶¶ 326, 331. When Plaintiff left the bathroom, he went directly to the casino's security desk.

*Id.*, at ¶ 333. Plaintiff claims that the security officer refused to listen to his side of the story but told Plaintiff not to go anywhere. *Id.*, at ¶¶ 334, 339. Eventually, the Head of Security for the Casino, Gregory Chevis, got involved. *Id.*, at ¶¶ 347–48. The young woman reiterated her claim and Plaintiff asked Mr. Chevis to review the casino's video footage. *Id.*, at ¶¶ 345, 348. The casino did review the footage and determined that the money belonged to Plaintiff. *Id.*, at ¶ 351. The dispute ended with Mr. Chevis telling the young woman to "go have fun" and instructing Plaintiff to leave her alone. *Id.*, at ¶ 356.

On Sunday, April 17, 2021, at about 3:00 a.m., Plaintiff, "after losing again," asked a casino employee "if she knew how one can ban himself." *Id.*, at ¶¶ 365–66. Plaintiff was directed to the security desk where he met a security officer who processed his request, which came as a surprise to Plaintiff. *Id.*, at ¶¶ 370–77. Instead of taking Plaintiff to the casino's management suite where he could be thanked for his years of play, the security guard walked him "through the entire casino floor" to a door near the parking garage that only employees could access. *Id.* This door led to a "process[ing]" area. *Id.*, at ¶ 378. Plaintiff was provided paperwork to complete. *Id.*, at ¶ 381. "Plaintiff signed the paperwork and told [the casino that] he want[ed] to have the fear of being arrested to deter [him] from ever coming near…" *Id.*, at ¶ 391. Plaintiff, however, did not return the paperwork to the casino, which led the security officers to tell him that "he was not yet banned" and that he "could even go play." *Id.*, at ¶¶ 396, 404.

Several months later, in July 2021, Plaintiff was in the casino playing a Fire Link machine. *Id.*, at ¶ 406. After a lengthy period of play, Plaintiff "pressed the cash out button," which caused the machine to start "making the noise it makes when the machine cannot print." *Id.*, at ¶ 425. Plaintiff inquired why the attendant was not fixing the machine and was told that the casino was determining whether Plaintiff had broken it. *Id.*, at ¶ 429, 430. Eventually, Plaintiff's ticket was

printed and he left. *Id.*, at ¶ 441. Days later, Plaintiff returned to the casino where he was approached by casino employees and asked to pay $1,300 in restitution in connection with the Fire Link machine. *Id.*, at ¶¶ 445, 453. The casino informed him that restitution payment must be made before he could play and that if payment was not made that he would be asked to leave. *Id.*, at ¶ 445. Plaintiff chose not to pay and left. *Id.*, at ¶ 456.

**ARGUMENT**

### I.    Standard of Review.

Federal Rule of Civil Procedure 12(b)(6) instructs that a Complaint should be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss, claims must be construed in the light most favorable to the non-moving party, and all well pleaded allegations should be accepted as true. *See Martin Marietta Corp. v. International Telecomm. Satellite Org.*, 991 F.2d 94 (4th Cir. 1992); *Wikimedia Found. V. National Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017). Dismissal is also appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense. *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996).

A complaint must state a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That showing must consist of more than a "formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ascraft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted); *see also Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964–65 (citations omitted). Rule 8(a)(2)'s showing requirement applies regardless of whether the complaint is filed by a litigant who is self-represented. *See Jackson v. Planet Home Lending, LLC*, Civil Action No. TDC–20–0773, 2021 WL 2209920, at *4 (D. Md. 2021) ("A self-represented party's complaint must be

construed liberally. However, a self-represented plaintiff must still carry 'the burden of alleging sufficient facts on which a recognized legal claim could be based.") (internal citations omitted). Moreover, the Court need not accept as true legal conclusions, unwarranted inferences, unreasonable conclusions, or arguments. *Eastern Shore Mkts., Inc v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *Lee v. O'Malley*, 533 F.Supp.2d 548, 550 (D. Md. 2007) ("However, while 'notice' pleading requires generosity in interpreting a plaintiff's complaint . . . generosity is not fantasy.'") (internal quotation omitted). Likewise, a court need not accept conclusory allegations concerning the legal effect of events plaintiff has alleged if those conclusions do not reasonably follow from his description of what happened. *Ficker v. Chesapeake & Potomac Telephone Co.*, 596 F.Supp. 900 (D. Md. 1984).

## II.    Plaintiff's Claims Of Unlawful Discrimination And Retaliation Under The CRA Are Barred By The Statute Of Limitations And, Therefore, Must Be Dismissed.

Although the CRA does not have a provision setting forth a statute of limitation, this Court must not "assume that Congress intended that there be no time limit on actions at all; rather, [its] task is to 'borrow' the most suitable statute or other rule of timeliness from some other source." *DelCostello v. International Broth. of Teamsters*, 462 U.S. 151, 158, 103 S. Ct. 2281, 2287 (1983) *superseded by statute*, Judicial Improvements Act of 1990, Pub. L. No. 101–650, § 313, 104 Stat. 5089, 5114–15 (codified at 28 U.S.C. § 1658(a)), *as recognized by Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 267–68 (4th Cir. 2018) (explaining Congress created a "four-year default statute of limitations for any 'civil action arising under an Act of Congress enacted' after December 1, 1990"). The Supreme Court of the United States has further stated that the most suitable statute is "the most closely analogous statute of limitations under state law." *DelCostello*, 462 U.S. at 158, 103 S. Ct. at 2287. State law thus governs whether Plaintiff timely filed his CRA claims. *See*

*McIver v. Russell*, 264 F.Supp. 22, 25–26 (D. Md. 1967) (reasoning that because "[n]o federal statute provides any limitations period with regard to 42 U.S.C. § 1983," the Annotated Code of Maryland provided the applicable limitations period).

Maryland Code, § 5–101 of the Courts and Judicial Proceedings Article directs that civil claims must be filed within three (3) years of the accrual date. § 5–101 ("A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."). In *McGill v. Koros*, No. JKB–20–03191, 2021 WL 4170402, at *1 (D. Md. 2021), this Court recently reiterated that § 5–101 is the appropriate statute to look to when conducting a limitations analysis for federal civil rights actions. *See also Kohler v. Shenasky*, 914 F.Supp. 1206, 1210 (D. Md. 1995); *Evans v. Chesapeake & Potomac Tel. Co. of Md.*, 535 F.Supp. 499, 500 (D. Md. 1982). Accordingly, Plaintiff's claims of unlawful discrimination and retaliation under the CRA are time-barred by § 5–101 since the underlying factual allegations occurred more than three (3) years in advance of when this Complaint was filed on June 23, 2022. Indeed, the Complaint only alleges instances of unlawful discrimination in 2017, 2018, and early 2019. Plaintiff's claims are stale and dismissal is statutorily required.

### III. Plaintiff's Claims Of Unlawful Discrimination And Retaliation Under The CRA Must Be Dismissed Because Plaintiff Did Not Notify Maryland's Commission On Civil Rights Before Filing Suit As Required By § 2000a–3(c).

Plaintiff's claims that Defendants violated his civil rights must be dismissed because Plaintiff failed to satisfy the statutorily imposed notice requirements. Sections 2000a–3(a) and(c) state, in full:

> (a)     Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 2000a–2 of this title, a civil action for preventive relief, including an application for a permanent or temporary injunction,

restraining order, or other order, may be instituted by the person aggrieved and, upon timely application, the court may, in its discretion, permit the Attorney General to intervene in such civil action if he certifies that the case is of general public importance. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the civil action without the payment of fees, costs, or security.

****

(c)       In the case of an alleged act or practice prohibited by this subchapter which occurs in a State, or political subdivision of a State, which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice or institute criminal proceedings with respect thereto upon receiving notice thereof, no civil action may be brought under subsection (a) before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority by registered mail or in person, provided that the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings.

§ 2000a–3 (underline added).

As this Court observed in *Hodge v. Cordish Companies, Inc., et al.*, Civil Action No. ELH–17–254, 2017 WL 3007069, at \*5 (D. Md. 2017), § 2000a–3(c) "sets forth a prerequisite for a plaintiff seeking relief under Title II of the Act." It further reasoned that because Maryland Code, § 20–1004 of the State Government Article "provides a process by which an aggrieved person can pursue relief through the Maryland Commission on Civil Rights" that "notice to the Commission" is required "prior to initiating suit" regardless of whether "defendants are private parties or government entities." *Id.*, at \*6; *see also Hodge v. Giant of Maryland, LLC*, Civil Action No. PWG–21–554, 2022 WL 4080317, *slip. op.* (D. Md. Sept. 6, 2022). Moreover, this Court has affirmed that § 2000(a)–3 authorizes only "suits for injunctive or declaratory relief, it does not permit suits for damages." *Hodge*, 2017 WL 3007069, at \*5 (citing *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 401, 88 S. Ct. 964, 966 (1968); *Gennell v. Denny's Corp.*, 378

F.Supp.2d 551, 556 (D. Md. 2005) (dismissing a claim of race discrimination in a place of public accommodation that sought only compensatory and punitive damages).

As applied here, the Complaint is entirely devoid of any averment that Plaintiff notified Maryland's Commission on Civil Rights prior to initiating this action. *See generally* DE #1. All that is alleged is that Plaintiff informed Defendant of his intention to sue. *Id.,* at ¶¶ 114, 139, 158, 241, 345, and 349. These allegations do not satisfy § 2000a–3(c) notice requirement since Defendants are not governmental entities capable of rendering the type of relief contemplated by the CRA. Plaintiff's claims under the CRA must be dismissed on this basis alone.

Even if Plaintiff had satisfied his notice obligations, dismissal is still required since the Complaint seeks money damages only. DE #1, at ¶ 14 ("Plaintiff seeks: [(a)] *1.2 million in Actual Damages*, or in the alternative whatever dollar amount the jury finds right and just[;] [(b)] 350,000.00. *Punitive Damages* for each category of the discriminatory count and for each unlawful acts and claims, like the malicious prosecution with the intent to discriminate or the alternative whatever dollar amount the jury finds right and just[;] and [(c)] *Legal Fees & Cost*, pursuant to 42 USC Chapter 21 § 1988(b)[;] [(d)] jury trial[;] and [(e)] the Service of the Attorney General, pursuant to § 2000a–5(a).)" As stated above, the CRA provides only injunctive or declaratory relief to aggrieved parties. Plaintiff's claims under the CRA must be dismissed because he is statutorily barred from pursuing the money damages he is seeking.

**IV.**     **Plaintiff's Claims Under The CRA Must Be Dismissed Because They Are Not Well-Pled.**

   **a.**     **Plaintiff's unlawful discrimination claim fails because the Complaint does not include sufficient factual support that Defendants were aware of his national origin and, even if they were, that they discriminated against Plaintiff on that basis.**

"In the public accommodations context, similar to claims under §§ 1981 & 1982, a plaintiff establishes a *prima facie* case of discrimination by showing that he or she (1) is a member of a protected class; (2) attempted to exercise the right to full benefits and enjoyment of a place of public accommodation; (3) was denied those benefits and enjoyment; and (4) was treated less favorably than similarly situated persons who are not members of the protected class." *McCoy v. Homestead Studio Suites Hotels*, 390 F.Supp.2d 577, 585 (S.D. Tex. 2005); *Shumate v. Twin Tier Hospitality, LLC*, 655 F.Supp.2d 521, 537 (M.D. Pa. 2009); *Wallace v. Cecil Cnty. Fair, Inc.*, Civil Action No. GLR–19–1802, 2020 WL 5742746, at *3 (D. Md. 2020).

The Complaint sets forth a litany of interactions between Plaintiff and casino employees over the course of several years that Plaintiff now characterizes as discriminatory, but it does not provide any factual support for the allegation (or inference) that Defendants even knew his national origin, much less discriminated against him on that basis. *See Wallace*, 2020 WL 5742746, at *3 (explaining that a plaintiff asserting that she was discriminated against in a place of public accommodations on the basis of her religion must show that the defendant was aware of her religious beliefs and discriminated against her because of same). Indeed, the Complaint fails to assert that any one of the many casino employees that Plaintiff interacted with knew that he was foreign born and of Albanian heritage. *See generally* DE #1. Plaintiff simply alleges that he looks and sounds foreign with imperfect English, *id.,* at ¶ 46, and that *ipso facto* is the reason and explanation for his subjective feelings of allegedly differential treatment. Plaintiff's threadbare

assertion is fundamentally self-serving to the narrative he now seeks to advance, and stands in direct conflict with the majority of Plaintiff's own allegations characterizing his many interactions with casino personnel over the course of many years. Plaintiff's characterization also wrongfully projects and attributes his own misguided assumptions onto casino personnel without any factual justification.

Even if the Complaint had sufficiently alleged that Defendants knew of Plaintiff's national origin, dismissal is still warranted because it fails to show that Defendants discriminated against him on that basis. Indeed, a fair reading of the Complaint shows just the opposite. Plaintiff's Complaint hinges on the inference that there cannot be any explanation for the alleged conduct except for a discriminatory purpose – but that simply is not so and that inference certainly is not supported by any allegations of fact. For instance, Plaintiff claims a casino security guard's decision to remove him from the premises because he was overbearing was discriminatory. *Id.*, at ¶ 239. The Complaint admits, however, that Plaintiff was not actively playing a game and that the security guard understood the reason for the removal to be because Plaintiff was "overshadowing" people, which is not discrimination based on national origin.

For the foregoing reasons, Plaintiff's claim that Defendants unlawfully discriminated against him based on national origin must be dismissed.

> **b.    Plaintiff's unlawful retaliation claim fails because Defendants had a non-discriminatory reason to exclude Plaintiff and because the Complaint lacks any factual basis for this Court to find that Plaintiff engaged in protected activity and suffered an adverse action by Defendants as a result.**

Plaintiff makes the conclusory claim that Defendants "retaliated" against him because he was excluded from the casino when he threatened legal action. DE #1, at ¶¶ 364–65. Plaintiff admits, however, that there is a legitimate dispute between the parties concerning property damage

to a video slot machine and that Defendants believed Plaintiff broke that machine and must pay restitution if he wants to patronize the casino again. *Id.,* at ¶¶ 425, 430, 445, 454. In other words, the Complaint on its face provides this Court with a patently non-discriminatory reason and justification for Plaintiff's exclusion from the premises. Defendants excluded Plaintiff from the casino because he owes restitution to Defendants in connection with the slot machine he broke. The Court need not go any further in its analysis of Plaintiff's retaliation claim.

If that admission were not sufficient to warrant dismissal, the balance of Plaintiff's remaining allegations fail to state a claim for "retaliation" under Title II. Title II's anti-retaliation provision has scarcely been the subject of judicial review; however, in those rare instances in which this Court has had occasion to do so, it has reviewed such claims through the analytical framework applicable to complaints of discrimination in the workforce. *Crumb v. McDonald's Corp.*, Civil Action No. DKC–15–1719, 2017 WL 6055501, at *5, n. 3 (D. Md. 2017) (construing a pro se complaint that included a retaliation charge as a 42 U.S.C. § 2000a action).  In that context, a plaintiff must "present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a causal link between the two events." *Eller v. Prince George's Cnty. Public Schools*, 580 F. Supp.3d 154, 178 (D. Md. 2022) (citing *Boyer-Liberto v. Fantainebleau Corp.*, 786 F.3d 264, 277, 281 (4th Cir. 2015). To state a prima facie case for retaliation, the temporal proximity between the alleged "protected activity" and the "materially adverse action" must also be "very close." *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 1511 (2001) (other citations omitted); *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022).  Based on Plaintiff's pleading, there is simply no basis for finding any causal link between any "protected activity" and any action that has been taken by Defendants that could be characterized as "retaliatory."

For the foregoing reasons, Plaintiff's claim under the CRA that Defendants unlawfully retaliated against him must be dismissed.

**V.      Plaintiff's Claim That Defendants Engaged In Unfair Or Deceptive Trade Practices In Violation Of Maryland's Consumer Protection Act ("MCPA") Must Be Dismissed Because The Complaint Fails To (1) Meet Fed. R. Civ. P. 9(b)'s Heightened Requirements And (2) Establish He Suffered An Objectively Identifiable Injury.**

Maryland Code, § 13–303(1) of the Commercial Law Article states: "A person may not engage in any unfair, abusive, or deceptive trade practices . . . in the sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services." The MCPA permits private causes of action to enforce § 13–303(1) so long as the plaintiff alleges "(1) an unfair or deceptive practice or representation that is (2) relied upon and (3) causes them actual injury." *Ayres v. Ocwen Loan Servicing, LLC*, 129 F.Supp.3d 249, 270 (D. Md. 2015). Accordingly, "under the MCPA, an individual can only bring a claim if he can 'establish the nature of the actual injury or loss that he or she allegedly sustained as a result of the prohibited practice.'" *Dwoskin v. Bank of America, N.A.*, 850 F.Supp.2d 557, 570 (D. Md. 2012) *(*quoting *Lloyd v. General Motors Corp.*, 397 Md. 108, 148, 916 A.2d 257, 280 (2007) (other quotation omitted). "[I]n other words, the consumer must have suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance" on the deceptive practice or representation. *Lloyd*, 397 Md. at 143, 916 A.2d at 277.

Plaintiff does not specify whether the MCPA claim he brings is based on an alleged misrepresentation or a deceptive practice. *See generally* DE #1. Fed. R. Civ. P. 9(b)'s heightened pleading standards applies in either case:

> Under the Consumer Protection Act, an "unfair and deceptive trade practice" replicates common-law fraud insofar as it includes "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent

> that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods . . ." Md. Code (1975, 2013 Repl. Vol.) § 13–301(9) of the Commercial Law Article. Accordingly, if a party alleges an "unfair or deceptive trade practice" under that specific subsection, he or she must allege fraud with particularity, as the *Lloyd* plaintiffs successfully did. *Lloyd*, 397 Md. at 154, 916 A.2d 257. Under other provisions of the act, however, a party can allege an "unfair and deceptive trade practice" without replicating a claim for common-law fraud. For example, an "unfair or deceptive trade practice" may include a "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers."

*McCormick v. Medtronics, Inc.*, 219 Md.App. 485, 529–30, 101 A.3d 467, 493–94 (2014); *see also Marchese v. JP Morgan Chase Bank, N.A.*, 917 F.Supp.2d 452, 465 (D. Md. 2013) (explaining that Fed. R. Civ. P. 9(b)'s heightened pleading standards apply to claims under the MCPA that involve misrepresentations since the MCPA sounds in fraud and that the failure to satisfy these more stringent standards is treated as a failure to state a claim under Rule 12(b)(6)); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783–84 (4th Cir. 1999) (stating that a Plaintiff must allege "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby" to satisfactorily plead the "circumstances" required under Fed. R. Civ. P. 9(b) and, further stating, "[m]ere allegations of 'fraud by hindsight' will not satisfy … Rule 9(b)").

The Complaint alleges that Defendants advertised the Progressive Sun Moon and Progressive Triple Seven Blazing machines as being "98% pay back machines." DE #1, at ¶ 50. Nowhere in the Complaint, however, does Plaintiff actually allege factual detail to plausibly demonstrate that this representation is or was false. *See generally id.* Plaintiff merely alleges that he relied on the advertisement when choosing to continue to play video slot machines. *Id.*, at ¶ 164 ("[Plaintiff] can't stop coming because he has lost tons of money here believing in good faith that these machines 'Triple Blazing Sevens' will one day pay him some of 98% of what [he has] lost.").

But, any claim that the advertisement is a misrepresentation is contradicted by the Complaint's acknowledgment that the video slot machines at issue did, in fact, pay out, to Plaintiff and other guests. *Id.*, at ¶ 152–53 ("They had seen Plaintiff and J. Lee, who played, as same as them, these *Blazing Sevens* almost every night, loose [sic], sometime 6-7 thousand dollars a night and go home broke, almost every night, while they as all other American born players in this casino had a lot of good nights, as well, as nights of terrible loss and nights of breaking even, but not like Plaintiff and Lee who lost every night and even if they hit once here and there a jackpot, it was almost nothing to how much they had put in.").

Plaintiff alleges that Defendants' video slot machines were programmed to monitor players' "black cards" or employed facial recognition technology to determine who was playing. *Id.*, at ¶ 155. But this threadbare allegation stands alone. *See generally id.* The Complaint does not allege any other actual facts that permit this Court to find that the Complaint sufficiently pleads the "circumstances" required under Fed. R. Civ. P. 9(b); *i.e.*, the time, place, contents, and person requirements. As such, the Complaint's allegation that Defendants programmed the video slot machines to monitor "black cards" or used facial recognition technology is wholly speculative (and, of course, entirely fanciful).

**VI.     Plaintiff's Common Law Claims Of Defamation, False Arrest, And Malicious Prosecution Must Be Dismissed.**

     **a.     The Complaint fails to set forth a viable defamation claim because it omits any allegation that Defendants published a statement or that such statement was false.**

"Under Maryland law, to present a prima facie case for defamation, a plaintiff must ordinarily establish that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff suffered harm." *Gohari v. Darvish*, 363 Md. 42, 54, 676 A.2d 321, 327 (2001) (citing

*Rosenberg v. Helinski*, 328 Md. 664, 675, 616 A.2d 866, 871 (1992) (other citations omitted). "A defamatory statement is one which 'tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Id.* (citing *Rosenberg*, 328 Md. at 675, 676 A.2d at 327); *see Metromedia, Inc. v. Hillman*, 285 Md. 161, 400 A.2d 1117, 1123 (1979) ("A statement that is defamatory per se is one for which the 'words themselves impute the defamatory character,' such that the plaintiff need not plead additional facts demonstrating their defamatory nature.").

Plaintiff asserts that Defendants committed "slander" by "embarrassing, humiliating, intimidating, and threatening" him "in the eyes of others." DE #1, at ¶ 6. Plaintiff purports to describe a few instances in which he used or attempted to use his "black card" that are alleged to have caused him some vague and unspecified level of grief. *Id.*, *e.g.*, at ¶ 70 (explaining Plaintiff felt humiliated after a Slot Attendant told him he could only block a video slot machine when going to eat or going to get money); at ¶¶ 105–09 and 115 (explaining Plaintiff felt humiliated when Slot Attendants Kim and Rhonda checked his 'black card' to determine whether he had been playing long enough to block a machine); at ¶ 221 (explaining Plaintiff felt humiliated when a security guard asked him to leave because he was "overshadowing" others); and at ¶ 339 (explaining Plaintiff felt humiliated when he visited the casino's security desk following his interaction with a woman at the ATMs who accused him of stealing money).

In none of these instances, however, does the Complaint even allege that Defendants made a defamatory statement to a third party. *See generally* DE #1. Accordingly, this Court must dismiss Plaintiff's defamation action for failure to state a claim upon which relief may be granted.

   b.    **The Complaint fails to set forth a viable claim that Defendants committed the tort of false arrest because Plaintiff was not deprived of his liberty.**

To bring a claim of false arrest, a plaintiff must show "1) the deprivation of the liberty of another; 2) without consent and 3) without legal justification." *Gray v. Maryland*, 228 F.Supp.2d 628, 641 (D. Md. 2002) (citing *Heron v. Strader*, 361 Md. 258, 264, 761 A.2d 56, 59 (2000)). "The test of legal justification, in the context of false arrest and false imprisonment, is 'judged by the principles applicable to the law of arrest.'" *Heron*, 361 Md. at 264, 761 A.2d at 59 (quoting *Montgomery Ward v. Wilson*, 339 Md. 701, 721, 664 A.2d 916, 926 (1995)); *see also Ashton v. Brown*, 339 Md. 70, 120, 660 A.2d 447, 472 (1995) ("[W]hile the presence or absence of probable cause to believe that a crime was committed may be pertinent in some cases with regard to the lawfulness of the arrest, the actual element of the tort of false [arrest] is legal justification rather than probable cause. To the extent that the lawfulness of an arrest does not turn upon probable cause under Maryland law, probable cause will not be determinative of the legal justification issue in a false [arrest] action based on that arrest.").

Plaintiff claims that Defendants falsely arrested Plaintiff when he voluntarily visited the casino's security desk after a fellow player accused him of stealing money from her. *See generally* DE #1, at ¶¶ 311–356. Plaintiff contends that, once there, "the security guard did not permit Plaintiff to go" and that he was "detain[ed]." Contrary to his current characterization, Plaintiff does not allege factual support on which this Court can plausibly find that Defendants deprived him of his liberty. *Id.*, at ¶¶ 336, 341. In fact, if anything, Plaintiff's allegations demonstrate that the supposed "false arrest" is a situation in which the casino was *asked by Plaintiff* to intervene in a dispute between players on the casino floor: the Complaint clearly states that Plaintiff *sought out* the security guard after his interaction with the woman who accused him of taking her money at

the ATMs. *Id.*, at ¶ 332. It further establishes that the casino's security guards never moved Plaintiff off the casino floor for questioning. *See generally id.*, at ¶¶ 332–356. Lastly, the Complaint suggests that the security guards' interaction with Plaintiff lasted just "minutes." *Id.*, at ¶ 347. As such, the Complaint lacks any basis for this Court to find that Plaintiff was deprived of his liberty other than his conclusory, and self-serving, allegation that he was "detained." Accordingly, Plaintiff's false arrest claim must be dismissed for failure to state a claim upon which relief may be granted.

      **c.**    **The Complaint fails to set forth a viable claim that Defendants committed the tort of malicious prosecution because no criminal proceedings were instituted.**

Plaintiff's Complaint includes a section entitled "Facts evidencing False Arrest & Malicious Prosecution against Plaintiff for the benefit and the interest of the American Born Guests." DE #1, at 59. To the extent that this Court construes this section as asserting a claim for malicious prosecution, Plaintiff has failed to state a claim. "A claim for malicious prosecution requires: (1) a criminal proceeding instituted or continued by the defendant against the plaintiff; (2) without probable cause; (3) with malice, or with a motive other than to bring the offender to justice; and (4) termination of the proceeding in favor of the plaintiff." *Bailey v. City of Annapolis*, 252 Md.App. 83, 94, 258 A.3d 894, 900 (2021) (citing *Candelero v. Cole*, 152 Md.App. 190, 199, 831 A.2d 495 (2003). The *Bailey* Court further opined that malicious prosecution is "*the unlawful use of legal procedure to bring about a legal confinement*." 252 Md.App. at 94, 258 A.3d at 900.

The Complaint is entirely devoid of any allegation that Defendants filed a criminal referral against Plaintiff or, as a result of such referral, that criminal proceedings were commenced and subsequently terminated in Plaintiff's favor. *See generally* DE #1. Plaintiff's malicious prosecution claim is specious, fails as a matter of law, and must be dismissed.

<u>**CONCLUSION**</u>

Based on the foregoing, Defendants respectfully request that this Honorable Court dismiss Plaintiff's Complaint for failure to state a claim upon which relief may be granted.

Respectfully submitted,

PILIEROMAZZA, PLLC

By:    */s/ Todd M. Reinecker*
Todd M. Reinecker (Bar No. 20782)
Matthew T. Healy (Bar No. 20999)
1910 Towne Centre Boulevard, Suite 250
Annapolis, Maryland, 21401
Telephone:    410–500–5551
Facsimile:    202–857–0200
Email: treinecker@pilieromazza.com
Email: mhealy@pilieromazza.com
***Counsel for Defendants PPE Casino Resorts Maryland, LLC & The Cordish Companies, Inc.***